UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JAMES SIMMONS,                                                          Plaintiff,

v.                                                    Civil Action No. 3:14-cv-P354-DJH

MIQUEL SOLÓRZANO *et al*.,                                           Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment[1] filed by Defendants Solórzano, Williams, and SinClair (Defendants) (Docket Numbers (DNs) 22 & 32).[2]  Plaintiff has not responded to the motion despite the Court ordering (DN 31) him to do so.  This matter is ripe for adjudication.

For the reasons set forth below, Defendants' motion will be granted.

## I. SUMMARY OF CLAIMS

After performing initial review of this case, the Court allowed the following two claims to continue:  (1) the Eighth Amendment sexual assault and harassment claim against Defendant Solórzano; and (2) the First Amendment retaliation claim against all three Defendants. Defendants seek summary judgment as to all claims.

In his complaint, Plaintiff alleged that from "June to September 2013 [he] was subjected to Sexual Assault and Sexual Harassment" by Defendant Solórzano during pat downs that

---

[1] Although Defendants caption their motion as one for summary judgment, they never refer to the summary-judgment rule, Rule 56 of the Federal Rules of Civil Procedure, or any other authority under which they are seeking the requested relief.  In the body of their motion, Defendants refer to the motion as a "Motion to Dismiss" (DN 32, p. 1) and repeatedly request this Court to dismiss Plaintiff's claims and complaint (DN 32, pp. 13, 15).  Regardless of whether the motion is one to dismiss or for summary judgment, the standard by which the Court is to review the motion is the same since Defendants have presented matters outside the pleadings.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c) matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

[2] Defendants' summary-judgment motion filed on December 22, 2015 (DN 32) is the redacted version of the motion for summary judgment originally filed on October 21, 2015 (DN 22).

occurred in the course of his job working in the Kentucky State Reformatory (KSR) kitchen. Plaintiff stated that Defendant Solórzano would conduct searches and routine pat-downs when Plaintiff was released from his shift working in the kitchen.  According to Plaintiff, during these searches and pat-downs, Defendant Solórzano would "group, rack [his] testicals, fondle [his] penis by holding [his] penis to the side while racking [his] testicals and running [his] hand up and down [Plaintiff's] legs and around [his] crouch area."  Plaintiff alleged that retaliation in the form of being fired from his job as a kitchen worker and being subjected to cell searches was taken against him for filing a grievance about the pat downs.

Defendants deny that any inappropriate touching occurred or that any retaliation was taken against Plaintiff.  In support of their motion for summary judgment, Defendants have filed a copy of an Incident Report filed by Defendant Solórzano, the Internal Affairs (IA) Unit investigative summary into Plaintiff's allegations, an affidavit signed by Defendant Solórzano, an affidavit signed by Defendant Williams, and copies of grievances filed by Plaintiff and four other inmates (Inmates #1-#4).

According to the documents filed by Defendants, on or about November 10, 2013, Plaintiff and two other inmates (Inmates #2 & #3) were terminated from their positions working in the kitchen at KSR.  DN 32-3, pp. 30-31.  Plaintiff contends that the termination happened because he had started speaking out on alleged incidents of inappropriate sexual touching by Defendant Solórzano.  DN 32-3, p. 30.  Defendants contend that Plaintiff and the other inmates were terminated because they had falsified documents.  *Id.*

On November 21, 2013, Defendant Solórzano completed an Incident Report regarding inmates working in the kitchen.  According to the Incident Report, some inmates had informed

Defendant Solórzano to watch his back because Plaintiff and another inmate "wanted pay back for [him] firing them from the kitchen."  DN 32-1.

On November 25, 2013, Plaintiff and Inmates #1-#4 filed grievances in which they alleged that Defendant Solórzano had inappropriately touched them and sexually harassed them during pat downs while working in the KSR kitchen.  DN 32-3.  IA conducted several interviews as part of the investigation of these grievances and the Incident Report.

On the same date the five inmates filed grievances, IA interviewed Inmate #1.  According to Inmate #1, Defendant Solórzano inappropriately touched him during pat down searches in the KSR kitchen.  DN 24, p. 1; DN 32-3, pp. 39-40.  When interviewed, Inmate #1 did not have any specific dates that the alleged wrongful touching occurred.  DN 24, p. 6.  [A]ccording to Inmate #1, he reported the allegations to Lieutenant James Tingle sometime in July 2013.  *Id.*  Inmate #1 stated that Plaintiff and another inmate were present when he spoke with Lieutenant Tingle about these events.  *Id.*  Inmate #1 also stated that he reported the incidents to Aramark workers, Mr. King and Ms. Alford, but he does not recall when.  DN 24, p. 2.  Inmate #1 admitted that he did not write the grievance, but that Plaintiff had written the grievance for him because he did not write very well and did not know how to file a grievance.  *Id.*

Later that same day, November 25, 2013, Plaintiff was interviewed by IA.  *Id.*  He stated that between the months of June 2013 and September 2013, he was subjected to pat downs that were incorrect and that he felt violated by Defendant Solórzano.  *Id.*  Plaintiff stated that in July 2013, he asked Lieutenant James Tingle to show him a proper pat down.  *Id.*  According to Plaintiff, after the demonstration, he advised Lieutenant Tingle about how Defendant Solórzano was performing his pat downs.  *Id.*  Plaintiff reported that Lieutenant Tingle stated that if the technique Plaintiff showed him were true, the technique was wrong.  *Id.*  Plaintiff stated that he

3

reported the issues with Defendant Solórzano to one of the security staff members but was not sure whether he spoke with Captain Stewart or Captain Chisholm.  *Id.*  IA spoke with both Captain Stewart and Captain Chisholm about having a conversation regarding inappropriate pat downs with Plaintiff.  DN 24, p. 3.  Neither Captain could recall any such conversation.  *Id.* According to Plaintiff, he also reported the issues to Aramark kitchen staff.  *Id.*  IA has never received any report from Aramark about Plaintiff's allegations.  *Id.*

On November 25, 2013, IA also interviewed Inmate #2.  *Id.*  Inmate #2 stated that he worked in the KSR kitchen until November 10, 2013, when he was placed on suspension by Defendant Solórzano for allegedly falsifying documentation.  *Id.*  Inmate #2 states that he was terminated from his job a week later.  *Id.*  Inmate #2 alleged that Defendant Solórzano had performed inappropriate pat downs on him, but could not remember any specific dates or times. *Id.*  He stated that he reported the incidents to Lieutenant Tingle and a Corrections Sergeant, but did not recall a name of the officer.  Inmate #2 stated that Plaintiff and Inmate #4 were present when he reported the incidents.  *Id.*  According to Inmate #2, these two officers showed him proper pat down technique.  *Id.*  When asked to show the interviewer the pat down technique used by Defendant Solórzano, Inmate #2 "was inconsistent about [Defendant Solórzano's] hand placement in relation to his genitals and the way [Defendant Solórzano] moved his hands during the search."  *Id.*  Inmate #2 stated that he did not file a grievance or report the allegations to anyone except Lieutenant Tingle.  *Id.*  Inmate #2 stated that he had been friends with Plaintiff for several years.  DN 24, p. 4.

Later that same day, Inmate #2 was interviewed a second time.  *Id.*  According to Inmate #2, several days before filing his grievance, he, Plaintiff, Inmate # 1, and Inmate #3 met in the KSR gym "complaining on [Defendant Solórzano]."  DN 24, p. 5.  After the meeting, Inmate #2

4

met with Plaintiff and gave Plaintiff a copy of his grievance against Defendant Solórzano.  *Id.*

Plaintiff returned the grievance to him the following day.  *Id.*  When questioned as to why the

body of his grievance was almost identical to Plaintiff's, Inmate #2 had no explanation.  *Id.*

Thereafter, Inmate #2 filed his grievance.  *Id.*

Inmate #3 was also interviewed on November 25, 2013.  DN 24, p. 4.  He too worked in

the KSR kitchen and had been patted down by Defendant Solórzano many times.  *Id.*  During his

interview, Inmate #3 stated that "a time or two" Defendant Solórzano "hit [him]" and groped him

a couple of times during pat downs.  *Id.*  He stated that on one occasion, Defendant Solórzano

"Turkey Tapped" him.  *Id.*  Inmate #3 stated that he complained to Defendant Solórzano, but

"his concerns went unchecked."  *Id.*  Inmate #3 stated that he was not an officer so he was not

sure if the pat-down searches were wrong.  *Id.*  Inmate #3 stated that he "was not sure if

[Defendant Solórzano] was following policy, and that it was possible that the Officer was

following policy."  *Id.*  According to Inmate #3, he told Plaintiff about the alleged wrongful pat

downs.  *Id.*  Inmate #3 did not report the incident to anyone.  *Id.*  Inmate #3 stated that Defendant

Solórzano suspended him from his job in the kitchen, but that he was later offered his job back.

*Id.*  In comparing the grievances filed by Inmates #1 and #3, investigators concluded that

Plaintiff had filled out both of these grievances.  *Id.*

The following day, November 26, 2013, IA interviewed Inmate #4.  According to this

inmate, he had worked in the KSR kitchen for approximately two years.  DN 24, p. 5.  During

this two-year period, Defendant Solórzano pat searched him on many occasions.  *Id.*  Inmate #4

stated that on one of those occasions Defendant Solórzano inappropriately touched him when he

was "[h]it" in the genitals "a little hard."  *Id.*  The allegations made in Inmate #4's interview

differed from those made in the grievance he had filed.  In his grievance, he had alleged that

Defendant Solórzano had inappropriately touched him on several occasions.  He had alleged that Defendant Solórzano had "grabbed [his] testicals and rubbed [his] penis for no reason." DN 32-3, p. 11.  When questioned about this inconsistency, Inmate #4 reiterated that he had only been inappropriately touched once.  DN 24, p. 5.  Inmate #4 stated that he informed Defendant Solórzano that he was hurt by that one search, but did not report the incident to anyone else.  *Id.*

Inmate #4 reported that Inmate #2, his cellmate, had told him that he did not like Defendant Solórzano, and that he had overheard or been a part of conversations in which Inmate #3 and Inmate #1 voiced their dislike of Defendant Solórzano.  *Id.*  Inmate #4 stated that he did not fill out his own grievance, but that Inmate #2 had filled it out.  *Id.*  Inmate #4 "assumed the reason [Inmate #2] ask[ed] him to file the grievance was to add to the other grievances filed by the other inmates in order have [Defendant Solórzano] removed from the kitchen." *Id.*  Inmate #4 stated that Inmate #2 told him not to inform investigators that Inmate #2 had filled out the complaint for Inmate #4.  DN 24, p. 6.  Inmate #4 admitted that he was aware that Plaintiff and Inmates #1, #2, and #3 "had discussed the plan to file grievances against [Defendant Solórzano] three weeks prior to the grievances being filed." *Id.*

Internal Affairs investigators spoke with Lieutenant Tingle on November 28, 2013.  *Id.* He recalled several inmates asking him in the summer about proper KSR pat-down technique. *Id.*  Lieutenant Tingle informed Defendant Solórzano that inmates had been asking him whether Defendant Solórzano was properly patting them down.  *Id.*  Lieutenant Tingle received no other complaints regarding pat-down technique, and he could not recall the names of the inmates who inquired about the pat-down technique.  *Id.*

On January 8, 2014, an official from the City of LaGrange Police Department contacted IA about a letter they had received and felt would best be handled by the Kentucky Department

of Corrections.  *Id.*  The letter was from Plaintiff's mother and stated that she wanted police officials to speak with six inmates at KSR about "the prison."  *Id.*  On January 10, 2014, Defendant Williams received correspondence from the Oldham County Commonwealth's Attorney (Attorney).  *Id.*  Included in the correspondence were three criminal complaints filed by Plaintiff, Inmate #2, and Inmate #3.  *Id.*  The Attorney indicated that she was leaving the matter up to IA investigators.  On this same date, Defendant Williams contacted the office of the Attorney and informed her that KSR IA had investigated the allegations of sexual harassment. *Id.*  The Attorney was informed that investigators had concluded that the "allegations were unfounded and that Investigators felt the allegations were false and that no further [action] was necessary in the matter."  *Id.*

On January 13, 2014, IA investigators were contacted again by the Oldham County Commonwealth's Attorney's Office.  *Id.*  The Commonwealth's Attorney's Office had received a letter from Plaintiff's mother in which she stated that she would be "pursuing this matter to the fullest extent of the law" and that if no official action was taken she would be contacting an attorney.  DN 24, p. 7.  "She also indicated that [Plaintiff] was railroaded in his Paducah KY case and that they will let any 'one be a judge.'"  *Id.*  On or about January 31, 2014, Defendant Williams received another correspondence from the Oldham County Commonwealth's Attorney's Office which contained a criminal complaint completed by Inmate # 1.  *Id.* Defendant Williams contacted the Attorney and informed her that this complaint was related to the other previously filed complaints and "was ruled unfounded and that no further action would be taken."  *Id.*

IA investigators concluded that the allegations against Defendant Solórzano were unfounded.  IA found that the evidence showed that Plaintiff and Inmates # 1-#4 "conspired with

each other to have [Defendant Solórzano] removed from the KSR kitchen," and that "[t]he Inmates involved in the allegation were angry with [Defendant Solórzano] for being terminated from the KSR kitchen." *Id.* Further, the IA investigation concluded that "these inmates provided false documentation in the form of grievances and criminal complaints." IA concluded that the inmates involved in this incident provided false statements to Investigators in regards to the allegations against [Defendant Solórzano]." *Id.*

On September 27, 2014, Defendant Williams conducted a second interview of Inmate #3 regarding the Defendant Solórzano investigation. DN 24, p. 8. Inmate #3 stated that Plaintiff and Inmate #1 initially approached him about pat-down searches performed by Defendant Solórzano. *Id.* A few days later Plaintiff approached Inmate #3 informing him that a grievance had been filled out and that Inmate #3 needed to sign it so that it could be turned into the grievance office. *Id.* Inmate #3 had never reported any incidents of inappropriate touching or misconduct on the part of Defendant Solórzano prior to being approached by Plaintiff and Inmate #1. Inmate #3 did not fill out the grievance nor did he ever read the grievance. *Id.* However, he did sign it. *Id.* Inmate #3 stated that he never felt that Defendant Solórzano sexually harassed him or touched him inappropriately. *Id.* Inmate #3 stated that "during a conversation with [Inmate #1 and Plaintiff], both inmates made comments about their dislike of [Defendant Solórzano] and that they were going to 'get him put out of the kitchen.'" *Id.* When questioned about the criminal complaint he had filed, Inmate #3 stated that after the grievance was filed, he was approached by Plaintiff who told him that a criminal complaint also needed to be completed. *Id.* Inmate #3 did not complete or read the criminal complaint before signing it, and he stated that he was not aware of the seriousness of the allegations in the complaint. *Id.* In his handwritten statement, Inmate #3 stated that Plaintiff wrote the grievance and criminal

complaint.  *Id.*  According to Inmate #3, the allegations in the grievance and complaint he signed were not true.  *Id.*

Defendant Solórzano has also filed an affidavit in this case.  DN 32-2.  In the affidavit he states that on November 21, 2013, while conducting a search in the KSR kitchen, a couple of inmates told him to watch his back because Plaintiff and another inmate wanted payback for Defendant Solórzano firing them from the kitchen.  *Id.*  Defendant Solórzano immediately reported this information to IA.  *Id.*  Defendant Solórzano was "later informed that several inmates had claimed I inappropriately touched them during routine searches and the allegations were unfounded."  *Id.*  Defendant Solórzano's affidavit continues as follows:

> I have never touched any inmate in a sexually inappropriate manner.  I have never sexually assaulted any inmate.  I have never sexually harassed any inmate, and I have never retaliated against any inmate.  Moreover, specifically, I did not grope the Plaintiff.  I did not "rack" the Plaintiff's testicles, I did not fondle the Plaintiff's penis, and I did not inappropriately run my hands up and down the Plaintiff's legs and crotch area.  Instead, pursuant to policy, the training I have received, and in accordance with my years of correctional experience, I performed a standard, DOC approved contraband search of all inmates assigned to the kitchen at the beginning and end of their designated shifts including the Plaintiff. Lastly, I did not retaliate against the Plaintiff by ordering or participating in any search of the Plaintiff's cell and the Plaintiff was not fired from his previous job in the kitchen as a result of any of his false allegations against me.

*Id.*

Defendant Williams also filed an affidavit in this case.  DN 32-4.  In his affidavit he states that he has been assigned to the IA Branch at KSR since November 2011.  He states that on November 22, 2013, Defendant Solórzano provided the IA Unit an incident report about possible conflicts with inmates working in the KSR kitchen.  Defendant Solórzano had reported that several kitchen workers advised him that Plaintiff and Inmate #2 were looking for payback against Defendant Solórzano following their termination from the kitchen.  *Id.*  According to the affidavit, on November 25, 2013, Defendant Solórzano informed IA that several inmates had

9

filed grievances against him.  *Id.*  The inmates made allegations that Defendant Solórzano had inappropriately touched them during pat-down searches over a period of time in 2013.  *Id.* Defendant Williams states in his affidavit that during interviews with the inmates who had filed grievances, "[i]nitially every inmate stated that [Defendant Solórzano] conducted his pat down searches inappropriately and several claimed to feel violated.  The inmates also admitted to being suspended and\or terminated from kitchen duty as a result of [Defendant Solórzano]."  *Id.*

According to Defendant Williams' affidavit, during the course of the investigation of these matters, "investigators received notice from the Oldham County Commonwealth's Attorney Office stating that criminal complaints had been filed against [Defendant Solórzano] and that they were requesting the DOC investigate the allegations."  *Id*.  IA investigators noticed "that the grievances and complaints filed by the inmates were identical and even the handwriting matched on several of the documents."  *Id.*  The affidavit continues as follows:

> During additional interviews, the inmates admitted that they did not actually write the complaints.  One of the inmates further admitted that he was aware of the fact that [Plaintiff and Inmates #1, #2, & #3], had discussed plans to file grievances against [Defendant Solórzano] three weeks prior to the first complaint being filed.
>
> On or about January 31, 2014, Internal Affairs concluded that based on the evidence the allegations against [Defendant Solórzano] were unfounded.  The evidence showed that [the] inmates . . . conspired with each other to have [Defendant Solórzano] removed from the KSR kitchen.  Investigators concluded that the inmates involved in the incident provided false statements in regards to the allegations.  As a result, IA determined that [Plaintiff's] and the other inmate's allegations were fabricated solely in an attempt to get [Defendant Solórzano] in trouble.
>
> The conclusion that the inmates' allegations were completely false was reinforced when, on September 27, 2014, a written statement was provided by one of the accusing inmates that fully disclosed [Plaintiff's] plan to falsely accuse [Defendant Solórzano] of the allegations.  The inmate stated that [Defendant Solórzano] had never inappropriately touched or sexually harassed either him or [Plaintiff].  The inmate admitted that both the grievance and the criminal

complaint filed in this incident were completed by [Plaintiff] and that the inmate just signed the document as instructed.

DN 32-4, pp. 1-2.

## II.  SUMMARY OF ARGUMENTS

Defendants argue that Plaintiff completely fabricated the allegations regarding the inappropriate touching by Defendant Solórzano in an attempt to get back at Defendant Solórzano for firing Plaintiff from his job in the kitchen.  Since no inappropriate touching occurred, Defendants argue, there can be no Eighth Amendment claim.  As to the retaliation claim, Defendants first argue that Plaintiff was not engaged in protected conduct since filing a grievance alleging fabricated events is not protected conduct.  Second, Defendants argue that no adverse action was taken against Plaintiff since he was fired from his kitchen job before Plaintiff filed his grievance.  Third, Defendants argue that any actions taken against Plaintiff were not impermissibly motivated by Plaintiff filing a grievance.

As previously indicated, Plaintiff failed to respond to the motion for summary judgment; thus, he raises no arguments in response to those raised by Defendants in their motion.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When the non-moving party fails to respond, the Sixth Circuit has "made it clear on many occasions that a district court abuses its discretion when it grants summary judgment solely because the non-moving party has failed to respond to the motion within the applicable time limit." *Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005) (citing *Stough v.*

*Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998) and *Carver v. Bunch*, 946 F.2d 451, 455

(6th Cir. 1991)). "When a non-moving party fails to respond, therefore, the district court must,

at a minimum, examine the moving party's motion for summary judgment to ensure that it has

discharged its initial burden." *Id.* (citing *Stough v. Mayville Cmty. Sch.*, 138 F.3d at 614).

## IV. ANALYSIS

### A. Eighth Amendment Inappropriate Touching

In his complaint, Plaintiff alleged that Defendant Solórzano inappropriately touched and

grabbed his genitalia while performing pat-down searches from June to September 2013. "It is

undisputed that the treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*,

509 U.S. 25, 31 (1993). The Eighth Amendment prohibits cruel and unusual punishments.

U.S. Const. amend. VIII. A punishment is cruel and unusual when it violates civilized standards

of decency or reflects unnecessary and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97,

102-03 (1976). Included among such impermissible punishments are those which are totally

lacking in penological justification, *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), and those

which evince "calculated harassment unrelated to prison needs." *Hudson v. Palmer*, 468 U.S.

517, 530, (1984). "[B]ecause the sexual harassment or abuse of an inmate by a corrections

officer can never serve a legitimate penological purpose and may well result in severe physical

and psychological harm, such abuse can, in certain circumstances, constitute the 'unnecessary

and wanton infliction of pain' forbidden by the Eighth Amendment." *Freitas v. Ault*, 109 F.3d

1335, 1338 (8th Cir. 1997) (citations omitted).

A viable Eighth Amendment claim has both an objective and a subjective component.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires that the pain

be sufficiently serious within the context of "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citation omitted). The subjective component requires a plaintiff to show that the defendant acted with deliberate indifference to the inmate's health or safety, *i.e.*, the plaintiff must show that prison officials had a "sufficiently culpable state of mind," where the officials were aware of and disregarded an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. at 834 (citation omitted).

The Court does not find a constitutional violation here because Defendants have shown that the wrongful touching about which Plaintiff complains did not occur, and Plaintiff has failed to demonstrate that it did occur.

In support of their motion for summary judgment, Defendants have filed the affidavit of Defendant Solórzano. In his affidavit he denies ever inappropriately touching Plaintiff. He states as follows:

> I have never touched any inmate in a sexually inappropriate manner. I have never sexually assaulted any inmate. I have never sexually harassed any inmate, and I have never retaliated against any inmate. Moreover, specifically, I did not grope the Plaintiff. I did not "rack" the Plaintiff's testicles, I did not fondle the Plaintiff's penis, and I did not inappropriately run my hands up and down the Plaintiff's legs and crotch area. Instead, pursuant to policy, the training I have received, and in accordance with my years of correctional experience, I performed a standard, DOC approved contraband search of all inmates assigned to the kitchen at the beginning and end of their designated shifts including the Plaintiff.

Defendants also provided the IA investigatory summary of Plaintiff's allegations. Defendants and four other inmates who had filed grievances similar to Plaintiffs were interviewed by investigators. The IA investigators concluded that the allegations against Defendant Solórzano were unfounded. They found that the evidence shows that Plaintiff and Inmates #1-#4 "conspired with each other to have [Defendant Solórzano] removed from the KSR kitchen. The Inmates involved in the allegation were angry with [Defendant Solórzano] for

being terminated from the KSR kitchen." They further found that "these inmates provided false documentation in the form of grievances and criminal complaints. Investigators concluded that the inmates involved in this incident provided false statements to Investigators in regards to the allegations against [Defendant Solórzano]."

Further, in his complaint, Plaintiff had alleged that the wrongful touching occurred between the months of June and September 2013. However, Defendants have shown that Plaintiff did not file any grievance about this allegedly ongoing wrongful conduct during that time period. Defendants have also shown that Plaintiff along with Inmate #2 and Inmate #3 were suspended from their jobs in the KSR kitchen on November 10, 2013. It was not until *after* he was removed from his job that Plaintiff filed any grievance about the alleged conduct of Defendant Solórzano. Defendants have also shown that at the time Plaintiff filed his grievance four other inmates filed similar grievances. All of the grievances were written by either Plaintiff or Inmate #2, both of whom had been fired from their kitchen jobs. All of the grievances alleged similar conduct by Defendant Solórzano during a similar time period. Yet, none of these other inmates filed a grievance about the conduct while it was allegedly occurring. All of the inmates filed their grievances at the same time and only after some of them had been fired from their jobs in the KSR kitchen. Further, none of the inmates could recall any dates on which the alleged wrongful conduct occurred. It is highly unlikely that the same allegedly wrongful conduct would be happening to five different inmates over a period of four to six months, yet not one of them file a grievance about the conduct at the time it was allegedly occurring or remember when the conduct occurred. Further, the timing of the filing of the grievances and the fact that all of the grievances were written by Plaintiff and another inmate that had been fired from their kitchen jobs supports Defendants' conclusion that the allegations were unfounded.

In fact, three of the inmates admitted in their IA investigation interviews that they were aware of or took part in conversations in which Plaintiff had discussed his dislike of Defendant Solórzano and his plan to get Defendant Solórzano out of the kitchen.  The first admission was by Inmate #2 who stated that a few days before filing the grievance he met with Plaintiff, Inmate #1, and Inmate #3 to discuss the "complaining on [Defendant Solórzano]" and the filing of their grievances.  The second admission was by Inmate #3 who stated that he took part in a conversation with Plaintiff and Inmate #1 in which they indicated their dislike for Defendant Solórzano and that they were going to get him out of the kitchen.  The third was by Inmate #4 who stated that he was aware that Plaintiff, Inmate #1, Inmate #2, and Inmate #3 had discussed a plan to file the grievances some three weeks before the grievances were actually filed.  Inmate #4 also stated that his cellmate, Inmate #2, had told him about his dislike for Defendant Solórzano.

Further, Defendant Solórzano had been warned by inmates on November 21, 2013, prior to Plaintiff filing a grievance, to watch his back because Plaintiff and another inmate "wanted pay back for [Defendant Solórzano] firing them from the kitchen."  Defendants have submitted a copy of the Incident Report submitted by Defendant Solórzano on November 22, 2013, to IA about this conversation.

Also included in the IA investigative summary provided by Defendants is a statement by Inmate #3 in which he states that Plaintiff is the one who wrote both the grievance and criminal complaint he filed.  Inmate #3 states that the allegations against Defendant Solórzano contained in both were not true.  He further states that he just signed the papers that Plaintiff brought to him without even reading them.

None of the Aramark employees or any KSR employees whom some of the inmates contend they reported the alleged wrongful conduct to remembers any inmates reporting such

16

conduct.  Lieutenant Tingle does recall some inmates asking him about proper pat-down technique sometime in the summer, but he received no other complaints about pat downs.

Defendants have also provided an affidavit signed by Defendant Williams.  In his affidavit he states that he has been assigned to the IA Branch at KSR since November 2011.  He states that on November 22, 2013, Defendant Solórzano provided the IA Unit an incident report about possible conflicts with inmates working in the KSR kitchen.  Defendant Solórzano had reported that several kitchen workers advised him that Plaintiff and Inmate #2 were looking for payback against Defendant Solórzano following their firing from the kitchen.  According to the affidavit, on November 25, 2013, Defendant Solórzano informed IA that several inmates had filed grievances against him alleging that he inappropriately touched them during pat-down searches.

According to Defendant Williams' affidavit, during the course of the investigation of these matters, "investigators received notice from the Oldham County Commonwealth's Attorney Office stating that criminal complaints had been filed against [Defendant Solórzano] and that they were requesting the DOC investigate the allegations."  IA investigators noticed "that the grievances and complaints filed by the inmates were identical and even the handwriting matched on several of the documents."  The affidavit continues as follows:

> During additional interviews, the inmates admitted that they did not actually write the complaints.  One of the inmates further admitted that he was aware of the fact that [Plaintiff and Inmates #1, #2, & #3], had discussed plans to file grievances against [Defendant Solórzano] three weeks prior to the first complaint being filed.
>
> On or about January 31, 2014, Internal Affairs concluded that based on the evidence the allegations against [Defendant Solórzano] were unfounded.  The evidence showed that [the] inmates . . . conspired with each other to have [Defendant Solórzano] removed from the KSR kitchen.  Investigators concluded that the inmates involved in the incident provided false statements in regards to the allegations.  As a result, IA determined that [Plaintiff's] and the other inmate's

allegations were fabricated solely in an attempt to get [Defendant Solórzano] in trouble.

The conclusion that the inmates' allegations were completely false was reinforced when, on September 27, 2014, a written statement was provided by one of the accusing inmates that fully disclosed [Plaintiff's] plan to falsely accuse [Defendant Solórzano] of the allegations.  The inmate stated that [Defendant Solórzano] had never inappropriately touched or sexually harassed either him or [Plaintiff].  The inmate admitted that both the grievance and the criminal complaint filed in this incident were completed by [Plaintiff] and that the inmate just signed the document as instructed.

Based on the documents provided by Defendants, it is clear that Plaintiff, Inmate #1, Inmate #2, Inmate #3, and Inmate #4 were displeased with Defendant Solórzano and conspired together to get him removed from the KSR kitchen.  Plaintiff and these other four inmates made false allegations regarding Defendant Solórzano in the grievances and criminal complaints they filed.  Plaintiff has failed to provide any documentation to refute Defendants' evidence or to support the allegations he made in his complaint.  Thus, the Court concludes that, with respect to the Eighth Amendment claim, Plaintiff has failed to meet his burden of setting forth "specific facts showing a triable issue."  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001).

Accordingly, summary judgment will be granted in favor of Defendants as to the Eighth Amendment inappropriate touching claim.

## B.  First Amendment Retaliation

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of

ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*

An inmate has a First Amendment right to file a grievance against prison officials. *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).  However, that right is protected only if the grievance is not frivolous.  *Id.*  "In other words, an inmate's pursuit of grievances against prison officials can constitute protected conduct for purposes of a retaliation claim, but 'only to the extent that the underlying claims ha[ve] merit.'"  *Clark v. Johnston*, 413 F. App'x 804, 812 (6th Cir. 2011) (quoting *Herron v. Harrison*, 203 F.3d at 415).

In his complaint, Plaintiff alleged that he was fired from his job in the kitchen at KSR and was subjected to cell searches for filing the grievance about Defendant Solórzano.  Defendants have provided an affidavit by Defendant Solórzano in which he states as follows:  "I did not retaliate against the Plaintiff by ordering or participating in any search of the Plaintiff's cell and the Plaintiff was not fired from his previous job in the kitchen as a result of any of his false allegations against me."  Further, as previously discussed, Defendants have shown and Plaintiff has not refuted that the allegations contained in the grievance filed by Plaintiff were false.  Since the underlying claims in Plaintiff's grievance lacked any merit, in filing this meritless grievance against Defendant Solórzano, Plaintiff was not engaging in protected conduct for retaliation purposes.  *Id.* ("Because [plaintiff] failed to establish that the underlying claim he was allegedly retaliated for had any merit . . . no constitutional violation occurred.").

Additionally, Defendants have shown that Plaintiff was removed from his job on or about November 10, 2013, and that Plaintiff filed his grievance on November 25, 2013.  It is clear from the record that Plaintiff was fired before the grievance was filed, and not as a result of the grievance.  Thus, the filing of the grievance cannot be protected conduct, and the alleged firing

could not have been motivated by the filing of Plaintiff's grievance.  *See King v. Zamiara*, 150 F. App'x 485, 493 (6th Cir. 2005) ("[B]ecause the grievances [plaintiff] proffers were filed after the officials allegedly took retaliatory action against him, the grievances cannot be evidence of protected conduct in this case.").

As to the retaliatory cell searches Plaintiff alleged in his complaint, Plaintiff fails to provide any information regarding the cell searches.  He provides no dates as to when the alleged cell searches occurred nor does he provide anything else about these searches.  In his affidavit, Defendant Solórzano denies ordering or participating in any of Plaintiff's cell searches.  Plaintiff is left solely with the unsupported statements he made in his complaint.  The Court need not accept unsupported or conclusory allegations.  *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

"'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'"  *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. at 380).  The Court concludes that no reasonable jury could believe Plaintiff's First Amendment allegations, which are contradicted by the record.  The Court further finds that Plaintiff has failed to meet his burden of setting forth "specific facts showing a triable issue" as to the alleged retaliation.  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d at 453.

For these reasons, summary judgment will be granted in favor of Defendants on the First Amendment retaliation claim.

## V.  <u>ORDER</u>

For the reasons stated above, **IT IS ORDERED** that Defendants' motion for summary

judgment (DNs 22 & 32) as to the remaining claims in this action, the Eighth Amendment

inappropriate touching claim and the First Amendment retaliation claim, is **GRANTED**.

Date:   April 26, 2016

**David J. Hale, Judge**
**United States District Court**

cc:   Plaintiff, *pro se*
       Counsel of record
4415.003

21